BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
PATRICIA N. SYVERSON (CA SBN 203111)
MANFRED P. MUECKE (CA SBN 222893)
600 W. Broadway, Suite 900
San Diego, California 92101
psyverson@bffb.com
mmuecke@bffb.com
Telephone: (619) 798-4593

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ELAINE A. RYAN (*To Be Admitted Pro Hac Vice*)
CARRIE A. LALIBERTE (*To Be Admitted Pro Hac Vice*)
2325 E. Camelback Rd. Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone: (602) 274-1100

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARA DUGGAN, LORI MYERS, ANGELA COSGROVE, ROBERT MCQUADE, COLLEEN MCQUADE, ANTHONY LUCIANO, LORI LUCIANO, ROBERT NUGENT, JAMES BORRUSO, FIDEL JAMELO, JOCELYN JAMELO, KEN PETROVCIK, AVRAHAM ISAC ZELIG, AMAR MODY, HEENA MODY, and MEGAN KIIHNE, On Behalf of Themselves and All Others Similarly Situated, | Case No.: |
| | **CLASS ACTION COMPLAINT FOR:** |
| | 1.  VIOLATION OF THE UNFAIR COMPETITION LAW, Business and Professions Code §§17200 *et seq.*; |
| | 2.  VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, Civil Code §§1750 *et seq.*; |
| Plaintiffs, | 3.  VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT – Fla. Stat. §§501.201, *et seq.*; |
| v. | 4.  VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349; |
| | 5.  VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, §56:8-2.10; |
| TRI-UNION SEAFOODS LLC, dba Chicken of the Sea International, Inc., | 6.  VIOLATION OF THE MINNESOTA |

1    a California Company,

2           Defendant.

PREVENTION OF CONSUMER FRAUD ACT (UNFAIR PRACTICES) – Minn. Stat. §§325F.68, *et seq.* and Minn. Stat. §§8.31, *et seq.*;

7.    VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (FALSE STATEMENT IN ADVERTISING) – Minn. Stat. §§325F.67, *et seq.*;

8.    VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT – Minn. Stat. §§325D.43, *et seq.*; and

9.    UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

Plaintiffs Tara Duggan, Lori Myers, Angela Cosgrove, Robert McQuade, Colleen McQuade, Anthony Luciano, Lori Luciano, Robert Nugent, James Borruso, Fidel Jamelo, Jocelyn Jamelo, Ken Petrovcik, Avraham Isac Zelig, Amar Mody, Heena Mody, and Megan Kiihne bring this action on behalf of themselves and all others similarly situated against Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea International, Inc. ("Chicken of the Sea" or "Defendant"), and state:

## FACTUAL ALLEGATIONS

1.       Chicken of the Sea tuna has been marketed, sold, and distributed throughout the United States since 1930.  Today, Tri-Union Seafoods is the largest canned tuna company and one of the largest seafood companies in the world with major brands in the United States and close to 20 other countries.

2.       Since 1990, Chicken of the Sea has promised consumers that its tuna is "Dolphin Safe".  Chicken of the Sea's canned tuna products prominently display a dolphin-safe logo on the front of their wrap around label immediately to the right of the Chicken of the Sea product name. The logo also is featured on Defendant's tuna pouches and cups.[1]  Since the introduction of the dolphin-safe policy in 1990, including the last 4 years (the "Class Period"), however, Chicken of the Sea's tuna has not been "Dolphin-Safe".

### **Origin of "Dolphin-Safe" Tuna**

3.       Prior to the development of modern purse seine fishing techniques, tropical tuna were caught one at a time using traditional pole-and-line methods. NOAA, The Tuna-Dolphin Issue, NOAA Fisheries Southwest Fisheries Science Center        (September        2,        2016),        *available        at* https://swfsc.noaa.gov/textblock.aspx?Division=PRD&ParentMenuId=228&id=1408 (last visited May 3, 2019).

---

[1] Defendant sells two tuna products in pouches (light and albacore) and three tuna products in cups (infusions, tuna to-go, and lunch solutions tuna salad.

4.      But by the 1950s, the development of synthetic netting (that would not rot in tropical waters) and hydraulically driven power-blocks (needed to haul very large nets) made it possible to deploy massive purse-seines (vertical net curtains closed by pulling on a chain located along the bottom to enclose the fish, much like tightening the cords of a drawstring purse) around entire schools of tuna.

5.      Recognizing that tuna schools (swimming deeper in the water) often congregate with dolphin schools (swimming at observable depths), fishermen began routinely encircling tuna *and* dolphin schools with purse seine nets and hauling the entire catch aboard.

6.      This practice led to millions of dolphins being killed as unintended bycatch.

7.      In the late 1980s, the world learned of the large numbers of dolphins indiscriminately killed by tuna fishermen. In 1988, a worldwide telecast showed video images of dolphins being killed in tuna fishing nets.  That video was captured by an undercover environmental activist posing as a ship's cook.  Public outcry was immediate and intense.

8.      Heightened public awareness of these mass dolphin deaths led to the development and enhancement of fishing regulations around the world, including a strengthening of the Marine Mammal Protection Act ("MMPA") and the enactment of the Dolphin Protection Consumer Information Act ("DPCIA") of 1990.

9.      Recognizing these indiscriminate fishing methods were also deflating consumers' enthusiasm for tuna products, the major sellers of tuna fish – including Chicken of the Sea, StarKist, and Bumble Bee – started promising consumers that the tuna they sold would only be procured through dolphin-safe fishing practices.

10.      In the ensuing 25 years, U.S. tuna sellers, including Chicken of the Sea, implemented a widespread and long-term marketing campaign that continues to this

day – representing to consumers that no dolphins were killed or harmed in capturing their tuna, as well as expressing their commitment to sustainably sourcing tuna.

11.    For at least the last 4 years, reasonable consumers expected that all canned tuna and pre-packaged tuna in pouches and cups (collectively, "tuna products"), are dolphin-safe because they have been indoctrinated to believe precisely that by Defendant's and the other tuna companies' highly effective dolphin safety and sustainably fishing practices marketing campaigns.  In fact, 98% of the prepacked tuna sold today in the United States is labeled with some "dolphin-safe" representation.  Forbes, K. William Watson, <u>'Dolphin Safe' Labels on Canned Tuna Are A Fraud</u> (April    29,    2015),    *available    at* https://www.forbes.com/sites/realspin/2015/04/29/dolphin-safe-labels-on-canned-tuna-are-a-fraud/#51db16b8295e (last visited May 3, 2019).

12.    Chicken of the Sea tuna, however, is not dolphin-safe.  Nor is it sustainably sourced. Defendant's dolphin-safe representations are false, misleading, and/or deceptive.

### Chicken of the Sea's Dolphin-Safe Representations

13.    In 1990, Chicken of the Sea was one of the first major tuna companies to adopt a "dolphin-safe" policy.

14.    On every can and pre-packaged tuna pouch and cup, Defendant states that the tuna products are "Dolphin Safe" with a prominent dolphin logo and encourages consumers of its canned tuna "to trace your fish" by visiting the Chicken of the Sea website.  Defendant's website, which is identified on all its tuna products, also sets forth Defendant's dolphin-safe policy.

15.    Chicken of the Sea's website explains what Defendant means by "dolphin-safe," and the meaning attributed to "dolphin-safe" by Defendant reflects its importance to consumers.  Defendant promises in pertinent part:

- Chicken of the sea remains "fully committed" to the "100% dolphin-safe policy" implemented in April 1990.  Chicken of the Sea, Frequently Asked Questions, *available at* https://chickenofthesea.com/company/faqs (last visited May 6, 2019).

- Chicken of the Sea is "committed to protecting dolphins." Chicken of the Sea, A Sea of Good, Company, *available at* https://chickenofthesea.com/company (last visited May 6, 2019).

- Chicken of the Sea will not purchase any tuna from vessels that net fish associated with dolphins. Chicken of the Sea, Frequently Asked Questions, *available at* https://chickenofthesea.com/company/faqs (last visited May 6, 2019).

- All fishing techniques are compliant with our Dolphin-Safe Policy. Chicken of the Sea, Know Your Seafood, *available at* https://chickenofthesea.com/company/know-your-seafood (last visited May 6, 2019).

- Chicken of the Sea will require certification of dolphin-safe fishing practices from all tuna suppliers.  Chicken of the Sea, Frequently Asked Questions, *available at* https://chickenofthesea.com/company/faqs (last visited May 6, 2019).

16.    As noted by the Ninth Circuit in a recent case, "[g]iven the choice of whether to purchase dolphin-safe tuna or to purchase tuna not labeled dolphin-safe, American consumers overwhelmingly chose to purchase tuna that was labeled dolphin-safe. As a result, foreign tuna sellers who did not adjust their fishing methods were quickly forced out of the market." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007) (rejecting Government efforts to lessen restrictions on tuna fisheries in the Eastern Tropical Pacific and upholding previous finding that best

evidence available indicates that tuna fishing was having significant adverse impact on dolphin stocks).

17.     The importance to consumers of dolphin safety has not lessened in the ensuing 12 years since the Court's finding, as evidenced by Defendant's continued labeling of its tuna products with a dolphin-safe logo.

18.     If anything, dolphin safety and the sustainable sourcing of seafood has grown in importance to consumers as evidenced by many retailers' refusal to sell tuna that is not caught using dolphin-safe pole-and-line, trolling[2], or handline catch methods.  *See, e.g.*, Whole Foods Market, Sustainable Canned Tuna, *available at* https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited April 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, Canned Tuna Sourcing Policy (August 15, 2018), *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited April 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, Safeway Announces New Sustainable Sourcing Practice for Tuna (February 10, 2012), *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html (last visited April 17, 2019);

---

[2] Method of fishing whereby one or more fishing lines with baits are drawn through the water.  Monterey Bay Aquarium Seafood Watch, Fishing & Farming Methods, *available at* https://www.seafoodwatch.org/ocean-issues/fishing-and-farming-methods (last visited May 3, 2019).

Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (August 2015), at 21, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited April 29, 2019) ("Suppliers are encouraged to "Not use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or eliminate by-catch"); H-E-B, H-E-B seafood policy, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited April 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, Tuna Policy, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited April 29, 2019) (encourages suppliers to "eliminate harvest with the use of non-entangling FADs"); Wegmans, Seafood Sustainability, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited April 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch.").

19.     Almost all retailers have implemented sustainable seafood sourcing policies and goals in response to customer feedback.  Kroger, for example, which operates 2,782 retail supermarkets in 35 states and the District of Columbia and serves over 9 million customers a day, has adopted a comprehensive sustainable sourcing program in response to customer feedback received at "in-store service counters, online surveys, telephone surveys, focus groups, websites and social media" as well as its live call "Kroger Customer Connect" center.  The Kroger Family of Companies 2018 Sustainability Report ("Kroger Sustainability Report"), *available*

*at* http://sustainability.kroger.com/Kroger_CSR2018.pdf (last visited April 17, 2019), at 12.

20.   The special "Dolphin Safe" logo Defendant includes on each Chicken of the Sea tuna product as shown below is intended by Defendant to convey the message "100% dolphin-safe"[3]:



21.   However, unknown to consumers, substantial numbers of dolphins and other marine life are killed and harmed by the fishermen and fishing methods used to catch Defendant's tuna.   Thus, Defendant's dolphin-safe label representations are false, misleading, and/or deceptive.

**Dolphin Safety Legislation**

22.   Since the 1980s, Congress has passed a series of laws to protect dolphins and other marine life from indiscriminate fishing methods.   Beginning with the MMPA, which Congress repeatedly strengthened in 1984, 1988, and 1992, Congress "ban[ned] importation of tuna that failed to meet certain conditions regarding dolphin mortality." *Earth Island Institute v. Evans*, No. C 03-0007-THE, ECF No. 293 at 3 (N.D. Cal.).

---

[3]   Chicken of the Sea, Frequently Asked Questions, *available at* https://chickenofthesea.com/company/faqs (last visited May 6, 2019).

- 7 -

Class Action Complaint

23.     Then, in 1990, Congress passed the DPCIA, which created the dolphin-safe mark.  16 U.S.C. §1385.  The Act provided that tuna could only be labeled with the official "dolphin-safe" mark codified at 50 CFR §216.95 if, *inter alia*, the tuna was not caught in the Eastern Tropical Pacific ("ETP") using nets intentionally deployed on or to encircle dolphins, was certified as dolphin-safe by an independent observer on the tuna boat, and can be traced from the fishery, to the cannery, to the shelf. *Id.*

24.     The DPCIA imposes heightened dolphin safety requirements which are not limited to ETP fisheries on manufacturers, like Defendant, who label their products with an alternative dolphin-safe logo.  16 U.S.C. §1385(d)(3).

25.     The DPCIA-established official dolphin-safe mark is codified at 50 CFR §216.95.   That official mark contains the words "U.S. Department of Commerce", along with the words "Dolphin Safe" in red next to a blue-colored dolphin profile facing the upper left, and a tricolor (light blue, blue, and dark blue) banner along the bottom of the mark that overlaps with the dolphin's fluke:



26.     Defendant elected not to utilize the DPCIA official dolphin-safe logo. By placing an alternative "Dolphin Safe" logo on Chicken of the Sea tuna products, rather than the official mark, Defendant voluntarily assumed the heightened dolphin safety requirements under the DPCIA applicable to all locations where Defendant

captures its tuna.  Pursuant to the regulations, Defendant must ensure that (1) "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught"; and (2) the label must be "supported by a tracking and verification program" throughout the fishing, transshipment and canning process; "periodic audits and spot checks" must be conducted, and Chicken of the Sea must provide "timely access to data required."  16 U.S.C. §§1385(d)(3)(C) and (f).

27.     To be clear, the Act and implementing regulations specify that "no" dolphins must be "killed or seriously injured" and if "a" dolphin "was killed or seriously injured [defined as 'any injury that will likely result in mortality' (50 CFR §216.3)]", the tuna is not dolphin-safe and must be stored physically separate from tuna that is dolphin-safe and must be supported by sufficient documentation to enable the National Marine Fisheries Service to trace the non-dolphin-safe tuna back to the fishing trip.  50 CFR §216.91.

28.     Plaintiffs allege that Defendant falsely represents that Chicken of the Sea tuna products are "Dolphin Safe" – meaning "no" dolphins were killed or seriously injured – when Defendant's tuna fishing practices kill or harm substantial numbers of dolphins each year.  And because Defendant does not adequately trace or otherwise identify the tuna that is not dolphin-safe and physically segregate and store it separately from any tuna that may be dolphin-safe, Defendant may not label any of its products as dolphin-safe.

**World Trade Organization Dispute Regarding "Dolphin-Safe" Labels**

32.     In 2008, a trade dispute erupted between Mexico and the United States over the use of a dolphin-safe representation on labels of prepacked tuna products sold in the United States pursuant to the DPCIA and the Ninth Circuit's holding in *Earth Island Institute v. Hogarth, supra*.

33.     Mexico, which fishes for tuna primarily in the ETP using purse seine nets, alleged that the DPCIA discriminated against Mexican tuna because it imposed

Class Action Complaint

stricter regulations and required more exacting documentary evidence of compliance with the Act for tuna caught in the ETP than in other fisheries.

34.    On September 15, 2011, the WTO Panel hearing the dispute issued its first Report.  The Panel disagreed that the DPCIA discriminates against Mexico, but also found the Act was more trade-restrictive than necessary to fulfill its legitimate objectives of ensuring (i) consumers are not deceived by dolphin-safe representations, and (ii) United States markets are not used to encourage tuna fishing practices that harm dolphins.  Both Mexico and the United States appealed.

35.    On May 16, 2012, the WTO Appellate Body issued its Report.  Among other findings, the Appellate Body found the DPCIA and the ruling in *Hogarth* together:

> set out a single and legally mandated definition of a "dolphin-safe" tuna product and disallows the use of other labels on tuna products that use the terms "dolphin-safe", dolphins, porpoises and marine mammals and do not satisfy this definition.  In doing so, the US measure prescribes in a broad and exhaustive manner the conditions that apply for making any assertion on a tuna product as to its "dolphin-safety", regardless of the manner in which that statement is made.

*See* Official Summary, WTO DS381, current through Jan. 31, 2019, *available at* https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm  (last visited May 10, 2019).

36.    However, the Appellate Body also found the DPCIA discriminated against Mexico.  In doing so, the Appellate Body:

> examined whether the different conditions for access to a "dolphin-safe" label are "calibrated" to the risks to dolphins arising from different fishing methods in different areas of the ocean, as the United States had claimed.  The Appellate Body noted the Panel's finding that the fishing technique of setting on dolphins is particularly harmful to dolphins and that this fishing method has the capacity of resulting in observed and unobserved adverse effects on dolphins.  **At the same time, the Panel was not persuaded that the risks to dolphins from other fishing techniques are insignificant and do not under some circumstances rise to the same level as the risks from setting on dolphins.**  The Appellate Body further noted  the Panel's finding that, while the US measure fully addresses the adverse effects on dolphins resulting

- 10 -
Class Action Complaint

(including observed and unobserved effects) from setting on dolphins in the ETP, it does not address mortality arising from fishing methods other than setting on dolphins in other areas of the ocean.  In these circumstances, the Appellate Body found that the measure at issue is not even-handed in the manner in which it addresses the risks to dolphins arising from different fishing techniques in different areas of the ocean.

*Id.* (emphasis added).

37.    In other words, the WTO Appellate Body found that fishing methods being employed in and out of the ETP were likely harming dolphin populations and the U.S. regulatory regime designed to protect dolphins was perhaps not strong enough in its regulation of fisheries outside the ETP.

38.    Following this Report, on May 31, 2012 Defendant, along with StarKist and Bumble Bee, issued the following press release through the National Fisheries Institute ("NFI"):

**STATEMENT ON WTO DOLPHIN SAFE TUNA RULING**

NFI is the leading seafood trade association in the United States and represents Bumble Bee, Chicken of the Sea and StarKist.

Household tuna brands Bumble Bee, Chicken of the Sea and StarKist are disappointed in the World Trade Organization's (WTO) appeals court ruling because it is likely to create consumer confusion about whether or not their products continue to be dolphin safe. **The three U.S. brands want to reassure consumers they have no reason to be concerned that their companies are wavering in their commitment to providing dolphin safe tuna as a result of this ruling. These companies do not and will not utilize tuna caught in a manner that harms dolphins. Providing consumers with sustainable and dolphin safe tuna remains a top priority.**

*See* States News Service Press Release, May 31, 2012 (emphasis added).

39.    Following the Appellate Body's Report and recommendations to strengthen the DPCIA, the United States made amendments to it that imposed additional requirements on tuna caught outside the ETP.  These amendments required that:

**all tuna sought to be entered into the United States as "dolphin-safe", regardless of where it was caught or the nationality of the fishing vessel, must be accompanied by a**

- 11 -
Class Action Complaint

**certification that (a) no nets were intentionally set on dolphins in the set in which the tuna was caught; and (b) no dolphins were killed or seriously injured in the sets in which the tuna was caught.**

*See* Official Summary, WTO DS381, current through Jan. 31, 2019 (emphasis added), *available at* https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm (last visited May 10, 2019).

## Chicken of the Sea's Fishing Practices and Violation of its Dolphin-Safe Representations

29.     Several tuna companies use traditional pole-and-line and trolling methods of catching tuna. These products include Safe Catch, Ocean Naturals (for its Albacore tuna), and Wild Planet, which are caught using pole-and-line and trolling, and American Tuna, Whole Foods 365 Everyday Value brand (for its skipjack and albacore tuna), and Trader Joe's (for yellowfin tuna), which are caught using exclusively pole-and-line.[4]

30.     While more costly, these traditional methods ensure that dolphins (and other bycatch) are not harmed in the fishing process because fish are caught using barbless hooks and poles one at a time near the sea's surface and unintended captured

---

[4] *See* Safe Catch, The Safe Catch Way, *available at* https://safecatch.com/ (last visited May 3, 2019); Ocean Naturals, Albacore, Responsibly Caught, *available at* https://oceannaturals.com/responsibly-caught/albacore-tuna/ (last visited May 3, 2019); Wild Planet, Good to the Core, Products-Tuna, *available at* https://www.wildplanetfoods.com/products/tuna/ (last visited May 3, 2019); American Tuna, American Tuna, Home, available at https://americantuna.com/ (last visited May 3, 2019); Whole Foods Market, Wild, Salt Added Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-wild-salt-added-tuna-10e1c0 (last visited May 3, 2019); Whole Foods Market, Albacore Wild Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-albacore-wild-tuna-5-oz-b83f86 (last visited May 3, 2019); Trader Joe's, About Trader Joe's Seafood, Announcements>Customer Updates (July 17, 2013), *available at* https://www.traderjoes.com/announcement/a-note-to-our-customers-about-trader-joes-seafood (last visited May 3, 2019).

species are easily released.  Tuna caught by these methods are actually "dolphin-safe."

31.    Despite representing that all fishing techniques used to capture its tuna are compliant with Defendant's "100% dolphin safe" policy, Chicken of the Sea is not among the tuna companies that use only dolphin-safe pole-and-line or trolling techniques to capture their tuna.  Rather, Defendant admits purchasing tuna from fishing vessels that use purse seine nets and longlines to capture tuna. Chicken of the Sea, Know Your Seafood, *available at* https://chickenofthesea.com/company/know-your-seafood (last visited May 6, 2019).  Both of these fishing methods kill and harm substantial numbers of dolphins.

32.    Longlines consist of a 40-80 mile long main line to which many smaller branch lines with baited hooks are attached to catch tuna.  Longlines are highly indiscriminate fishing gear as they attract large numbers of target and non-target fish, as well as dolphins, that get snagged on the hooks by their mouth or other body parts when they go after the bait and then remain on the line for extended periods of time as the lines are drawn in to the vessel and the catch is obtained.  The hooked fish are retrieved by mechanically pulling the main line back onto the fishing vessel, which can take 10 hours.  As dolphins are oxygen breathers, most do not survive the 10-hour retrieval process.  And any that do are often not released.

33.    Even when dolphins are mistakenly caught by these longlines, they are often not released.  Rather, the fishermen that catch these dolphins often kill them onboard and have been photographed posing with their catch, mutilating the dolphins and removing their teeth, which can be used as currency.  Because of the harm caused to non-target fish, longlines have been condemned by environmental groups like the World Wildlife Foundation ("WWF") as an unsustainable fishing practice.  WWF, Bycatch, Threats, *available at* www.worldwildlife.org/threats/bycatch (last visited May 3, 2019).

Class Action Complaint

34.    Purse seine nets also trap, kill, and harm substantial numbers of dolphins.  Because purse seine nets can reach more than 6,500 feet in length and 650 feet deep – the equivalent of 18 football fields by 2 football fields[5]– they often entrap dolphins when drawn closed, particularly because many of the purse seine fishing vessels use free floating rafts of flotsam known as fish aggregating devices, or FADs, to capture tuna.

35.    FADs are known as floating death traps because dolphins and other marine life get entangled in the devices and their sheer numbers estimated at 30,000 to 50,000 per year disrupt behavior and movement patterns of dolphins and other ocean species crucial to their survival.

36.    While FADs are extremely effective at luring tuna, they also attract dolphins – particularly in the ETP where schools of tuna routinely gather beneath schools of dolphins to reduce the risk of predation.  The tuna, dolphins, and other marine life are all then caught in the gigantic mile circumference purse seine nets that are deployed around the FAD to catch the tuna.

37.    Since the 1980s, changes in the design of nets and fishing practices that allow dolphins to escape the net have significantly reduced dolphin mortality.  Brown 2016.   Nonetheless, significant numbers of dolphins (over a thousand a year according to NOAA[6]) are still harmed by this method as unintended bycatch can account for more than 30% of a ship's haul.  And, even though unintended bycatch may still be alive when dumped out of the nets onto the boat, by the time they are thrown back into the ocean, most are dead or near dead.

38.    Even when dolphins escape the purse seine nets or are released alive from the longlines and nets, dolphins are harmed by these fishing practices.

---

[5] Elizabeth Brown, Fishing Gear 101: Purse Seines – The Encirclers (June 6, 2016), *available at* http://safinacenter.org/2015/12/fishing-gear-101-purse-seines-the-encirclers/ (last visited May 3, 2019) ("Brown 2016").
[6] NOAA 2016.

- 14 -
Class Action Complaint

39.     Several studies have observed a number of indirect ways these fishing practices cause additional unobserved dolphin deaths, including: dolphin mother-calf separation as calves are dependent upon their mothers until weaned 1.5 years postpartum, and, even then, the calves do not reach full muscle maturation until age 3; acute cardiac and muscle damages caused by the exertion of avoiding or detangling from the FADs and purse seine nets; cumulative organ damage in released dolphins due to overheating from escape efforts; failed or impaired reproduction; compromised immune function; and unreported mortalities due to under-counting by purse-seine fishing vessels. *See, e.g.*, Department of Commerce, Reilly, *et al.*, <u>Report of the Scientific Research Program Under the International Dolphin Conservation Program Act</u>, NOAA Technical Memorandum NMFS (March 2005), at 67-71, 76 *available at* https://swfsc.noaa.gov/publications/TM/SWFSC/NOAA-TM-NMFS-SWFSC-372.PDF (last visited May 3, 2019).  *See also* Wade, et al., *Depletion of spotted and spinner dolphins in the eastern tropical Pacific: modeling hypotheses for their lack of recovery*, Mar Ecog Prog Ser 343:1-14, 2007, at 11 (noting "[a] summary of recent research … clearly illustrates that the purse seine fishery has the capacity to affect dolphins beyond the direct mortality observed as bycatches"); Kellar, et al., *Pregnancy patterns of pantropical spotted dolphins (Stenella attenuata) in the eastern tropical Pacific determined from hormonal analysis of blubber biopsies and correlations with the purse-seine tuna fishery*, Mar Biol (2013) 160:3113-3124, at 3120 (tuna fishery reduces likelihood of female becoming pregnant or maintaining pregnancy).

40.     As the indirect harmful effects of Defendant's fishing practices also "likely result in [dolphin] mortality" (50 CFR § 216.3), Defendant's tuna is not dolphin-safe.  It is conservatively estimated that the total reported dolphin mortality is underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins

given these indirect harmful effects and unobserved and underreported kills. Reilly, *et al.*, 2005, at 7.

41.     Because the use of FADs, purse seine nets, and longlines are unsustainable fishing practices, several companies that supply the U.S. tuna market will not source their tuna from boats that use these indiscriminate fishing methods. But Chicken of the Sea is not among these companies.  For example, to avoid competition from its primary market rivals over the sale of FAD-free tuna (which would be more expensive), in or about February 2012, Chicken of the Sea allegedly entered into a written agreement with Bumble Bee Foods LLC and StarKist Co., who together with Defendant control 70-80% of the U.S. canned tuna market, whereby none of them would sell a branded FAD-free tuna product in the U.S.  *See* Tom Seaman,  <u>Lawsuits:  US  brands  colluded  on  not  selling  FAD-free  tuna</u>, undercurrentnews>analysis>US Investigates Tuna Brands>Companies (July 18, 2016),  *available  at*  https://www.undercurrentnews.com/2016/07/18/lawsuits-us-brands-colluded-on-not-selling-fad-free-tuna/ (last visited May 3, 2019).

42.     Because "Chicken of the Sea sources its tuna from destructive fishing methods that unnecessarily kill vulnerable marine life," including "purse seines employing FADs," and "provides little information on product labels about where and how its tuna is caught," Greenpeace has consistently ranked Defendant near the bottom of its list of well-known tuna brands when it comes to responsible sourcing of  tuna.  Greenpeace,  <u>2017  Tuna  Shopping  Guide</u>,  *available  at* https://www.greenpeace.org/usa/oceans/tuna-guide/ (last visited April 17, 2019) (ranking Chicken of the Sea 15th out of 20).

## **<u>Chicken of the Sea Does Not Track and Report the Numbers of Dolphins Killed or Maimed in Capturing Its Tuna</u>**

43.     Defendant's use of an alternative dolphin-safe logo on its tuna products requires it to track, audit, and spot check for accuracy that "no dolphins were killed

or seriously injured in the sets or other gear deployments in which the tuna were caught" from capture, to transshipment[7], to cannery, to shelf.   And, in the event that even a single dolphin is "killed or seriously injured" during the catch, Defendant must physically separate and store that catch from any tuna catches in which no dolphins were harmed (if any) and maintain records tracing the catch(es) in which dolphins were harmed back to the fishing vessel and trip.  50 CFR §216.91.

44.    Unlike fisheries in the ETP, boats in the other oceanic regions that supply Chicken of the Sea tuna are not required to have independent observers onboard to track and report the number of dolphins killed or seriously injured. 16 U.S.C. §1385(d)(1).  A declaration from the ship's captain that no purse seines were intentionally set on dolphins suffices.  16 U.S.C. §1385(d)(1)(B).  These declarations are limited to certifying that "no purse seine net was intentionally deployed on or used to encircle dolphins during the particular voyage on which the tuna was harvested" and do not require certification that FADs, gillnets, longlines and other dolphin-harming fishing techniques were not used.  Nor must the captain quantify the number of dolphins killed or otherwise harmed.  There is a strong financial incentive for a captain to falsely certify a catch is "dolphin-safe," as any catch that is not "dolphin-safe" is essentially worthless.  And, it is relatively simple to do so as the majority of certifications are paper-based and typically filled in by hand – often after the vessel has returned to port – making it virtually impossible to adequately verify these certifications.

45.    Instead, Defendant is solely responsible for collecting information about

---

[7] Transfer of a shipment from one carrier, or more commonly, from one vessel to another whereas in transit. Transshipments are usually made (1) where there is no direct air, land, or sea link between the consignor's and consignee's countries, (2) where the intended port of entry is blocked, or (3) to hide the identity of the port or country of origin.    Business Dictionary, transshipment, *available at* http://www.businessdictionary.com/definition/transshipment.html (last visited May 3, 2019).

the number of dolphins killed or seriously injured, which Defendant fails to do. Defendant does not track, trace, and report the number of dolphins killed or harmed by Defendant's tuna fishing vessels even though Defendant is able to do so.  As confirmed on Chicken of the Sea's webpage entitled "Dive into the story of your seafood", Chicken of the Sea is able to trace each tuna product sold in the U.S. to the vessel that caught it, the ocean where it was caught, the method used to catch the tuna, and the cannery where it was processed.  Chicken of the Sea, <u>Dive into the story of your seafood</u>, *available at* https://chickenofthesea.com/trace (last visited May 6, 2019).

46.     By purchasing its tuna from fishing vessels that use purse seine nets deployed around FADs and/or longlines, Chicken of the Sea is able to reduce its tuna product costs by using less costly fishing methods that kill or harm dolphins.  This enables Chicken of the Sea to sell its tuna at a lower price and capture more of the declining tuna market, which has experienced a 40% per capita decline over the last 30 years.

### Chicken of the Sea's MSC Logo and Sustainable Fishing Practices Misrepresentations

47.     Defendant's tuna pouches are labeled with a prominent blue MSC logo, which stands for Marine Stewardship Council, on the front of the pouch to the immediate left of the Chicken of the Sea product name which states: "Certified Sustainable Seafood MSC www.msc.org":



48.     On its website, Defendant explains that: "MSC certified products must meet vigorous standards for sustainable fishing practices, like limiting bycatch (unwanted fish), avoid overfishing and protecting marine environment".  Chicken of the Sea, Marine Stewardship Council Certification, Sustainability, *available at* https://chickenofthesea.com/msc (last visited May 13, 2019).

49.     Defendant explains that it is committed to a comprehensive approach to sustainability that it has trademarked "SeaChange®", which includes its dolphin-safe policy, working with the International Seafood Sustainability Foundation ("ISSF") and WWF to utilize the best conservation measures and MSC certification.  *Id.*

50.     Defendant's sustainability representations and its use of the MSC certified sustainability logo are false, deceptive, and/or misleading because it uses longlines and purse seines employing FADs to capture its tuna that kill and/or harm dolphins and other marine life.

51.     Notwithstanding their organizations' names and purported sustainable fishing practice mission statements, neither the ISSF nor the MSC support the banning or effective control of FADs, longlines, or other unsustainable fishing techniques.

52.     For example, in or about October 2018, over 800,000 tonnes of industrial boats were certified by the MSC – 10 times more than available before.[8] As the massive number of MSC certified vessels attests, certification does not guarantee only dolphin-safe sustainable fishing methods are used.   Far from it, as the MSC will certify fisheries using gill nets even though it recognizes that gill nets "carry the risk of bycatch (accidental capture of unwanted species) and interaction with other marine animals".  MSC, Gillnets, *available at* https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types/gillnets   (last   visited

---

[8]   Fish4Ever, Fishy Business (October 4, 2018), Blog, *available at* https://fish4ever.blog/2018/10/04/fishy-business/ (last visited May 8, 2010).

May 6, 2019). The MSC also will certify companies like Chicken of the Sea who use longlines to capture tuna even though it recognizes longlines "can have unintended interaction with non-target fish, sea birds and other marine life." MSC, Longlines, *available at* https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types/longlines (last visited May 6, 2019). And companies like Chicken of the Sea who use purse seine nets to catch tuna congregating around FADs also qualify for MSC certification even though the MSC recognizes FADs also "can result in higher levels of bycatch". MSC, Purse seine, *available at* https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types/purse-seine (last visited May 6, 2019). In fact, the only fisheries the MSC will not certify are those using explosives and poisons. MSC, Fishing methods and gear types, *available at* https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types (last visited May 6, 2019). In short, Chicken of the Sea's MSC label logo does not mean it uses only "certified sustainable" tuna fishing methods as represented, which Defendant does not do. Thus, Defendant's labeling of its tuna pouches with the MSC logo and its sustainable fishing methods representations are false, misleading, and/or deceptive.

53. The MSC's certification of companies like Chicken of the Sea who use indiscriminate, destructive, and unsustainable fishing techniques has caused the WWF – the very organization that created the MSC in 1997 – to criticize MSC's certification protocols and to call for a number of specific changes, including a requirement to minimize unwanted bycatch. Greenpeace, Assessment of the Marine Stewardship Council (MSC) Fisheries Certification Programme, *available at* https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/report/2009/7/assessment-of-the-msc.pdf (last visited Apr. 17, 2019).

54. The MSC also has been criticized as being unduly influenced by its

financial dependence on the fishing industry that its standards govern.  The MSC collects approximately $20M per year in licensing fees from its certified members. Its revenues are also dependent on the amount of fish certified, as it .5% of the value of the fish it certifies.

55.     Like the MSC, the ISSF lacks the independence and impartiality to embrace and champion meaningful sustainability practices and industry reform.  It was created in 2009 by Chicken of the Sea and several other big tuna companies and its funding comes from corporate fees which are several hundreds of thousands of dollars for large companies like Chicken of the Sea.  As noted by Greenpeace when refusing an invite to join ISSF's Environmental Stakeholder Committee, the "ISSF's role [is] to deflect attention from the real problems, and to delay adoption of real solutions that its corporate members would prefer to avoid" such as banning FADs and other harmful fishing techniques that its corporate members use and simply allows its members "to brandish their ISSF membership as a way to deflect criticism." Greenpeace, How the International Seafood Sustainability Foundation (ISSF)     Blocks     Environmental     Action,     *available     at* https://www.greenpeace.org/usa/oceans/sustainable-seafood/how-international-seafood-sustainability-foundation-blocks-environmental-action/ (last visited April 17, 2019).

56.     Because Chicken of the Sea uses longlines, purse seine nets, and FADs, and other well-known dolphin-harming fishing techniques, notwithstanding its MSC certification and ISSF membership, Chicken of the Sea's labeling of its tuna products with the MSC certified sustainability logo and its sustainable fishing practices representations are false, misleading, and/or deceptive.

### Chicken of the Sea, Unlike Many Other Tuna Companies, Does Not Use Dolphin-Safe Tuna Fishing Methods

57.     Unlike several other tuna companies who sell to the U.S. market,

Class Action Complaint

Defendant has not adopted dolphin-safe fishing practices, such as pole-and-line, trolling, and/or handline catch methods, whereby fishermen catch one fish at a time and release unwanted species soon after a fish takes the bait.

58.    Most U.S. retailers have sustainability guidelines and expectations of their seafood suppliers that include: using recognized dolphin-safe tuna capture methods, having programs in place to trace the tuna back to the boat and place of capture, and guaranteeing the catch method used. *See, e.g.*, Whole Foods Market, Sustainable Canned Tuna, *available at* https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited April 17, 2019); Whole Foods Market, Canned Tuna Sourcing Policy, *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited April 17, 2019); PR Newswire, Safeway Announces New Sustainable Sourcing Practice for Tuna (February 10, 2012), *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html (last visited April 17, 2019); Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (August 2015), at 3, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited May 3, 2019) ("Safeway-Albertsons will strive to purchase environmentally preferable products"); H-E-B, H-E-B seafood policy, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited May 3, 2019); Sprouts, Sustainable Seafood Policy, *available at* https://about.sprouts.com/product-sourcing/sustainable-seafood-policy/ (last visited April 17, 2019); Giant Eagle, Tuna Policy, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited April 17, 2019) ("Our goal is to source tuna only from healthy and well-managed stocks, from fisheries using the most current best practice in methods, bycatch

Class Action Complaint

reduction and environmentally responsible, socially responsible, Non GMO, BPA free and priced reasonably for our consumers"); Wegmans, Seafood Sustainability, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited April 17, 2019); Publix, Publix Sustainability Report 2019, *available at* https://sustainability.publix.com/wp-content/uploads/sustainability-report.pdf (last visited April 17, 2019) (supplier commitment to sustainable fishing "helps us decide whether to sell a product, enhance fisheries through improvement projects or halt the sale of a product until the issue is resolved."). Tuna companies who do not use dolphin-safe catch methods and do not adhere to traceability requirements can expect retailers to refuse to sell their products.

59. By expressing a commitment to sustainability, labeling its tuna products as dolphin-safe, labeling its tuna pouches as MSC certified, not tracking and reporting the number of dolphins killed and harmed in capturing its tuna, and not separating tuna that is not dolphin-safe from tuna caught where no dolphins were harmed (if any), Defendant is able to sell its Chicken of the Sea tuna products in several major retail stores to which it would otherwise be denied entry.

## Chicken of the Sea's use of the MSC Logo and Dolphin-Safe Sustainability Representations are False, Misleading, and/or Deceptive

60. Because dolphins are killed and harmed by the fishing methods used to catch the tuna in Defendant's products; Defendant does not adequately track, verify, audit, and spot check the number of dolphins killed and harmed; and Defendant does not separately store the tuna that is not dolphin-safe, Chicken of the Sea's use of the alternative dolphin-safe logo and its dolphin-safe representations, its use of the MSC logo, and its sustainability representations are false, misleading, and/or deceptive.

61. Reasonable consumers rightly believe that "dolphin-safe" means "no" dolphins were harmed in the process of catching the tuna in Defendant's products.

That is precisely the regulatory definition of dolphin-safe.  50 CFR §§216.3, 216.91. And it is the message that Chicken of the Sea has consistently conveyed to the public in its widespread and long-term advertising and marketing campaign.

62.    Dolphin safety matters to consumers and it materially affects their decision whether to purchase Chicken of the Sea tuna.  So, too, does the use of sustainable fishing practices that, among other things, minimize the amount of unwanted bycatch.  If consumers knew Chicken of the Sea's tuna products were not dolphin-safe and/or not caught using sustainable fishing methods, they would not buy Defendant's tuna products, particularly because there are several competing brands of like tuna products that are dolphin-safe and sustainably sourced. Thus, Plaintiffs and Class members are entitled to a full refund.

63.    Any nutrient value notwithstanding, because Defendant's false dolphin-safe representations and/or unsustainable catch methods taint the entire purchase – from whether Chicken of the Sea tuna that was not dolphin-safe and/or not sustainably caught would even be sold by retailers to whether consumers would purchase Chicken of the Sea tuna that was not dolphin-safe and/or sustainably caught if available for purchase – consumers, like Plaintiffs here, are entitled to a full refund. The importance consumers place upon dolphin safety and their abject distaste for indiscriminate and destructive fishing methods makes tuna fish consumers no different from Hindus attributing zero value to beef products, or vegans attributing zero value to animal products, or vegetarians attributing zero value to meat, fish, and poultry, no matter what nutritive value these products may otherwise have. Further, if the retailers of Defendant's tuna products knew they were not sustainably sourced and dolphin-safe, they would refuse to sell Defendant's tuna products.  This too entitles Plaintiffs and Class members to a full refund.

64.    Alternatively, Plaintiffs and Class members are entitled to the premium attributable to the dolphin-safe and sustainable fishing practices representations.

65.     Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who purchased the tuna products to halt the dissemination of this false, misleading, and deceptive advertising message, correct the misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the tuna products. Based on Defendant's unjust enrichment and violations of California, Florida, New York, New Jersey, and Minnesota unfair competition laws (detailed below), Plaintiffs seek damages, declaratory, injunctive, and restitutionary relief for consumers who purchased the tuna products.

## JURISDICTION AND VENUE

66.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and some members of the Class are citizens of a state different from Defendant.

67.     This Court has personal jurisdiction over Defendant because Defendant is authorized to conduct and do business in California, including this District. Defendant marketed, promoted, distributed, and sold the tuna products in California, and Defendant has sufficient minimum contacts with this State and/or sufficiently availed itself of the markets in this State through its promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

68.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events giving rise to Plaintiff Duggan's claims occurred while she resided in this judicial district.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this District.

## PARTIES

69.     Plaintiff Tara Duggan resides in Marin County, California and is a citizen of California.  Throughout the relevant period, Plaintiff Duggan routinely was

Class Action Complaint

exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna in water at stores such as Lucky's and Fairfax Market in her area.  Plaintiff Duggan purchased the tuna products for approximately $3.50.  At all relevant times, Plaintiff Duggan was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Duggan known the tuna was not dolphin-safe and/or had Defendant not represented the tuna was dolphin-safe, Plaintiff Duggan would not have purchased the tuna products.  As a result, Plaintiff Duggan suffered injury in fact and lost money at the time of purchase. Plaintiff Duggan continues to desire to purchase Chicken of the Sea products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the tuna product. Indeed, Plaintiff Duggan regularly visits stores such as Lucky's and Fairfax Market where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

70.   Plaintiff Lori Myers resides in Moreno Valley, California and is a citizen of California.  Throughout the relevant period, Plaintiff Myers routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned and pouched tuna in water through Instacart, Amazon, and at Ralph's in Canyon Crest Town Center in Riverside, California.  Plaintiff Myers purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Myers was unaware that the tuna was not dolphin-safe as represented and was caught using fishing

methods that are harmful to dolphins.  Had Plaintiff Myers known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Myers would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Myers suffered injury in fact and lost money at the time of purchase. Plaintiff Myers continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Myers regularly purchases online and visits stores such as Ralph's and Stater Brothers, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

71.    Plaintiff Angela Cosgrove resides in Pompano Beach, Florida and is a citizen of Florida.  Throughout the relevant period, Plaintiff Cosgrove routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna in water and canned yellowfin tuna at various stores in her area, including Big Lots, Publix, and Walmart.  Plaintiff Cosgrove purchased the canned tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Cosgrove believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Cosgrove known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Cosgrove would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Cosgrove suffered injury in fact and lost money at the time of purchase.  Plaintiff Cosgrove

1   continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-

2   safe tuna caught using fishing methods that do not harm dolphins, and she would

3   purchase such a product manufactured by Defendant if it were possible to determine

4   prior to purchase whether no dolphins were harmed in capturing the tuna in the

5   product. Indeed, Plaintiff Cosgrove regularly visits stores such as Big Lots, Publix,

6   and Walmart, where Defendant's tuna products are sold, but will be unable to rely

7   upon the dolphin-safe representations and will not be able to determine if the tuna in

8   the products is dolphin-safe and was caught using fishing methods that do not harm

9   dolphins when deciding whether to purchase the tuna products in the future.

10       72.     Plaintiff Robert McQuade resides in Bronxville, New York and is a

11   citizen of New York.  Throughout the relevant period, Plaintiff Robert McQuade

12   routinely was exposed to, saw, and relied upon Defendant's dolphin-safe

13   representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna

14   products including canned tuna in water and tuna in pouches at various stores in

15   Bronxville, Yonkers, Eastchester and Tuckahoe, New York, including ACME, Shop-

16   Rite, Stop & Shop, and Costco.  Plaintiff Robert McQuade purchased the tuna

17   products many times throughout the relevant period.  At all relevant times, Plaintiff

18   Robert McQuade believed the tuna products were dolphin-safe and was unaware that

19   the tuna was not dolphin-safe as represented and was caught using fishing methods

20   that are harmful to dolphins.  Had Plaintiff Robert McQuade known the tuna was not

21   dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe,

22   Plaintiff Robert McQuade would not have purchased the Chicken of the Sea tuna

23   products.  As a result, Plaintiff Robert McQuade suffered injury in fact and lost

24   money at the time of purchase.  Plaintiff Robert McQuade continues to desire to

25   purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught

26   using fishing methods that do not harm dolphins, and he would purchase such a

27   product manufactured by Defendant if it were possible to determine prior to purchase

28

1   whether no dolphins were harmed in capturing the tuna in the product. Indeed,

2   Plaintiff Robert McQuade regularly visits stores such as ACME, Shop-Rite, Stop &

3   Shop, and Costco, where Defendant's tuna products are sold, but will be unable to

4   rely upon the dolphin-safe representations and will not be able to determine if the

5   tuna in the products is dolphin-safe and was caught using fishing methods that do not

6   harm dolphins when deciding whether to purchase the tuna products in the future.

7       73.    Plaintiff Colleen McQuade resides in Bronxville, New York and is a

8   citizen of New York.  Throughout the relevant period, Plaintiff Colleen McQuade

9   routinely was exposed to, saw, and relied upon Defendant's dolphin-safe

10  representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna

11  products, including canned tuna in water and tuna in pouches at various stores in

12  Bronxville, Yonkers, Eastchester and Tuckahoe, New York, including ACME, Shop-

13  Rite, Stop & Shop and Costco. Plaintiff Colleen McQuade purchased the tuna

14  products many times throughout the relevant period.  At all relevant times, Plaintiff

15  Colleen McQuade believed the tuna products were dolphin-safe and was unaware

16  that the tuna was not dolphin-safe as represented and was caught using fishing

17  methods that are harmful to dolphins.  Had Plaintiff Colleen McQuade known the

18  tuna was not dolphin-safe and/or had Defendant not represented that the tuna was

19  dolphin-safe, Plaintiff Colleen McQuade would not have purchased the Chicken of

20  the Sea tuna products.  As a result, Plaintiff Colleen McQuade suffered injury in fact

21  and lost money at the time of purchase.  Plaintiff Colleen McQuade continues to

22  desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna

23  caught using fishing methods that do not harm dolphins, and she would purchase

24  such a product manufactured by Defendant if it were possible to determine prior to

25  purchase whether no dolphins were harmed in capturing the tuna in the product.

26  Indeed, Plaintiff Colleen McQuade regularly visits stores such as ACME, Shop-Rite,

27  Stop & Shop, and Costco, where Defendant's tuna products are sold, but will be

28

- 29 -

Class Action Complaint

unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

74.     Plaintiff Anthony Luciano resides in Eastchester, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Anthony Luciano routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna products, including canned tuna in water and oil at various stores in Eastchester, Yonkers, Tuckahoe, New Rochelle and the Bronx, New York, including Stop & Shop, Shop Rite, ACME, Foodtown, and Costco.  Plaintiff Anthony Luciano purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Anthony Luciano believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Anthony Luciano known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Anthony Luciano would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Anthony Luciano suffered injury in fact and lost money at the time of purchase.  Plaintiff Anthony Luciano continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Anthony Luciano regularly visits stores such as Stop & Shop, Shop Rite, ACME, Foodtown, and Costco , where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using

- 30 -
Class Action Complaint

fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

75.     Plaintiff Lori Luciano resides in Eastchester, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Lori Luciano routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna products, including canned tuna in water and oil at various stores in Eastchester, Yonkers, Tuckahoe, New Rochelle and the Bronx, New York, including Stop & Shop, Shop Rite, ACME, Foodtown, and Costco.  Plaintiff Lori Luciano purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Lori Luciano believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Lori Luciano known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Lori Luciano would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Lori Luciano suffered injury in fact and lost money at the time of purchase.  Plaintiff Lori Luciano continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Lori Luciano regularly visits stores such as Stop & Shop, Shop Rite, ACME, Foodtown, and Costco , where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

76.     Plaintiff Robert Nugent resides in Staten Island, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Nugent routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna products, including canned tuna in water, at a Stop & Shop, Shop Rite and Key Food in Staten Island, New York.  Plaintiff Nugent purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Nugent believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Nugent known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Nugent would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Nugent suffered injury in fact and lost money at the time of purchase.  Plaintiff Nugent continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Nugent regularly visits stores such as Stop & Shop, Shop Rite and Key Food where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

77.     Plaintiff James Borruso resides in Staten Island, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Borruso routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna products, including canned tuna in water and oil, at a Stop & Shop and Pathmark in Staten Island, New

Class Action Complaint

York.  Plaintiff Borruso purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Borruso believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Borrusso known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Borrusso would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Borruso suffered injury in fact and lost money at the time of purchase.  Plaintiff Borruso continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Borruso regularly visits stores such as Stop & Shop and Pathmark, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

78.    Plaintiff Fidel Jamelo resides in Bronx, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Fidel Jamelo routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna products, including canned tuna in water, at a Costco in New Rochelle, New York.  Plaintiff Fidel Jamelo purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Fidel Jamelo believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Fidel Jamelo known the tuna was not dolphin-safe and/or had Defendant not represented that the

Class Action Complaint

tuna was dolphin-safe, Plaintiff Fidel Jamelo would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Fidel Jamelo suffered injury in fact and lost money at the time of purchase.  Plaintiff Fidel Jamelo continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Fidel Jamelo regularly visits stores such as Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

79.     Plaintiff Jocelyn Jamelo resides in Bronx, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Jocelyn Jamelo routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna products, including canned tuna in water, at a Costco in New Rochelle, New York.  Plaintiff Jocelyn Jamelo purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Jocelyn Jamelo believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Jocelyn Jamelo known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Jocelyn Jamelo would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Jocelyn Jamelo suffered injury in fact and lost money at the time of purchase.  Plaintiff Jocelyn Jamelo continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she

would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Jocelyn Jamelo regularly visits stores such as Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

80.     Plaintiff Ken Petrovcik resides in Belvidere, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Petrovcik routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna products, including canned tuna in water, at various stores in Belvidere, New Jersey, including Walmart and Shop-Rite.  Plaintiff Petrovcik purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Petrovcik believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Petrovcik known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Petrovcik would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Petrovcik suffered injury in fact and lost money at the time of purchase.  Plaintiff Petrovcik continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Petrovcik regularly visits stores such as Walmart and Shop-Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the

products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

81.  Plaintiff Avraham Isac Zelig resides in Manalapin, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Zelig routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna products, including canned tuna in water, at various stores, including Costco in Staten Island, New York and Costco and Shop-Rite in Marlboro, New Jersey.   Plaintiff Zelig purchased the tuna products many times throughout the relevant period.   At all relevant times, Plaintiff Zelig believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Zelig known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Zelig would not have purchased the Chicken of the Sea tuna products. As a result, Plaintiff Zelig suffered injury in fact and lost money at the time of purchase.  Plaintiff Zelig continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Zelig regularly visits stores such as Costco and Shop-Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

82.  Plaintiff Amar Mody resides in Jersey City, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Amar Mody routinely was

exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna products, including canned tuna in water, at various stores in Jersey City, New Jersey, including Shop Rite and ACME.  Plaintiff Amar Mody purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Amar Mody believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Amar Mody known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Amar Mody would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Amar Mody suffered injury in fact and lost money at the time of purchase.  Plaintiff Amar Mody continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Amar Mody regularly visits stores such as Shop Rite and ACME, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

83.    Plaintiff Heena Mody resides in Jersey City, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Heena Mody routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea tuna products, including canned tuna in water, at various stores in Jersey City, New Jersey, including Shop Rite and ACME.  Plaintiff Heena Mody purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Heena Mody believed

- 37 -
Class Action Complaint

the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Heena Mody known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Heena Mody would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Heena Mody suffered injury in fact and lost money at the time of purchase.  Plaintiff Heena Mody continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Heena Mody regularly visits stores such as Shop Rite and ACME, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

84.     Plaintiff Megan Kiihne resides in Winona, Minnesota and is a citizen of Minnesota.  Throughout the relevant period, Plaintiff Kiihne routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the Chicken of the Sea canned tuna in water and tuna in pouches at various stores in Winona, Minnesota, including Walmart and Midtown Foods.  Plaintiff Kiihne purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Kiihne believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Kiihne known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Kiihne would not have purchased the Chicken of the Sea tuna products.  As a result, Plaintiff Kiihne suffered injury in fact

and lost money at the time of purchase.  Plaintiff Kiihne continues to desire to purchase Chicken of the Sea tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Kiihne regularly visits stores such as Walmart and Midtown Foods, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

85.   Defendant Tri-Union Seafoods LLC, dba Chicken of the Sea International, Inc., is a limited liability company organized, existing, and doing business under the laws of the State of California, with its headquarters and principal place of business located in San Diego, California, and is a citizen of California. Chicken of the Sea operates its tuna processing facility in Lyons, Georgia.  During the time period relevant to Plaintiffs' claims, Chicken of the Sea produced and sold canned tuna and tuna pouches throughout the United States and its territories; sold canned tuna and tuna pouches to Plaintiffs and others in the United States; and engaged in the false, misleading, and deceptive advertising alleged in this Complaint.

## CLASS DEFINITION AND ALLEGATIONS

86.   Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers pursuant to Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure and seek certification of the following Classes:

> **Nationwide Class**
> All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products in the United States.
>
> Excluded from this Class are Defendant and its officers, directors, employees and those who purchased the tuna products

for the purpose of resale.

87.   Alternatively, Plaintiffs Duggan and Myers seek certification of the following California-Only Class:

**California-Only Class**
All California consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

88.   In addition, Plaintiff Cosgrove seeks certification of the following Florida-Only Class:

**Florida-Only Class**
All Florida consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

89.   In addition, Plaintiffs Robert and Colleen McQuade, Plaintiffs Anthony and Lori Luciano, Plaintiffs Fidel and Jocelyn Jamelo, and Plaintiffs Borruso and Nugent seek certification of the following New York-Only Class:

**New York-Only Class**
All New York consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

90.   In addition, Plaintiffs Amar and Heena Mody and Plaintiffs Zelig and Petrovcik seek certification of the following New Jersey-Only Class:

**New Jersey-Only Class**
All New Jersey consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

91.    In addition, Plaintiff Kiihne seeks certification of the following Minnesota-Only Class:

**Minnesota-Only Class**

All Minnesota consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

92.    **Numerosity**.  The members of the Classes are so numerous that their joinder is impracticable.  Plaintiffs are informed and believe that the proposed Classes contain thousands of purchasers of the tuna products who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiffs.

93.    **Existence and Predominance of Common Questions of Law and Fact**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a) whether Defendant's dolphin-safe representations, use of the MSC logo, and sustainable fishing practices representations are false, misleading, and/or objectively reasonably likely to deceive;

(b) whether Defendant failed to comply with traceability and verification requirements;

(c) whether Defendant engaged in fishing practices that harmed dolphins;

(d) whether Defendant's alleged conduct is unlawful;

(e) whether the alleged conduct constitutes violations of the laws asserted;

(f) whether Defendant engaged in false, misleading and/or deceptive advertising; and

(g) whether Plaintiffs and Class members are entitled to appropriate remedies, including damages, restitution, corrective advertising, and injunctive relief.

94. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Classes because, *inter alia*, all Class members were injured through the uniform misconduct described above. Plaintiffs are also advancing the same claims and legal theories on behalf of themselves and all Class members.

95. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

96. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents

no unusual management difficulties under the circumstances here.

97.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Classes, on grounds generally applicable to the entire Classes, to enjoin and prevent Defendant from engaging in the acts described and requiring Defendant to provide full restitution to Plaintiff and Class members.

98.     Unless a Class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and Class members.

99.     Unless an injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Classes and the general public will continue to be deceived and not know whether the dolphin-safe representations and/or sustainable fishing methods representations are true or if the tuna products continue to contain tuna caught using fishing methods that are harmful to dolphins.

100.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to: (a) whether Defendant marketed and sold its tuna products as "Dolphin Safe" when they were not; (b) whether Defendant's conduct was unlawful, unfair, or fraudulent in violation of state consumer protections law; (c) whether Defendant's misrepresentations would deceive a reasonable consumer; (d) whether Defendant has been unjustly enriched; (e) whether Defendant failed to comply with federal law in branding its tuna products "Dolphin Safe"; and (f) whether Defendant's misrepresentations regarding its tuna products would be material to a reasonable consumer.

**COUNT I –
Violation of California Business & Professions Code §§17200, *et seq.*
(On Behalf of the Nationwide or California-Only Class)**

101.   Plaintiffs repeat and re-allege the allegations contained in the

- 43 -
Class Action Complaint

1  paragraphs above, as if fully set forth herein.

2      102.   Plaintiffs bring this claim individually and on behalf of the Nationwide

3  or California-Only Classes.

4      103.   The Unfair Competition Law, Business & Professions Code §§17200,

5  *et seq.* ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or

6  practice and any false or misleading advertising.   More specifically, the UCL

7  provides, in pertinent part: "Unfair competition shall mean and include unlawful,

8  unfair, or fraudulent business act or practice and unfair, deceptive, untrue or

9  misleading advertising . . . ."

10     104.   **Unlawful Business Practices:** In the course of conducting business,

11  Defendant committed "unlawful" business practices in violation of the UCL by, *inter*

12  *alia*, making the dolphin-safe representations and sustainable fishing methods

13  representations, and using the MSC logo, which are false, misleading, and/or

14  deceptive (which also constitute advertising within the meaning of §17200; failing to

15  comply with traceability and verification requirements, as set forth more fully herein;

16  and violating California Civil Code §§1572, 1573, 1709, and 1711; the California

17  Legal Remedies Act, California Civil Code §§1750, *et seq.*; California Business &

18  Professions Code §§17200, *et seq.* and 17500, *et seq.*, and 16 U.S.C. §1385.

19     105.   Plaintiffs reserve the right to allege other violations of law, which

20  constitute other unlawful business acts or practices. Such conduct is ongoing and

21  continues to this date.

22     106.   **Unfair Business Practices:** In the course of conducting business,

23  Defendant committed "unfair" business acts or practices by, *inter alia*, making the

24  dolphin-safe representations and sustainable fishing method representations, and

25  using the MSC logo, which are false, misleading, and/or deceptive (which also

26  constitute advertising within the meaning of §17200), and failing to comply with

27  traceability and verification requirements, as set forth more fully herein.  There is no

28

societal benefit from false advertising, only harm. While Plaintiffs and the public at large were and continue to be harmed, Defendant has been unjustly enriched by its false, misleading, and/or deceptive representations as it unfairly enticed Plaintiffs and Class members to purchase its tuna products instead of similar tuna products sold by other manufacturers that were dolphin-safe, sustainably caught, stored separately from non-dolphin-safe tuna, traceable, and verified.   Because the utility of Defendant's conduct (zero) is outweighed by the gravity of harm to Plaintiffs, consumers, and the competitive market, Defendant's conduct is "unfair" having offended an established public policy embodied in, among other things, 16 U.S.C. §1385, where Congress expressly found that it is the policy of the United States to protect the dolphin population and that "consumers would like to know if the tuna they purchase is falsely labeled as to the effect of the harvesting of the tuna on dolphins."  16 U.S.C. §§1385(b)(2)-(3).

107.   Defendant also engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to the public at large.

108.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

109.   **Fraudulent Business Practices:** In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, *inter alia*, making the dolphin-safe representations and sustainable fishing methods representations, and using the MSC logo, which are false, misleading, and/or deceptive to reasonable consumers, and by failing to comply with traceability and verification requirements, regarding the tuna products as set forth more fully herein.

110.   Defendant's actions, claims, and misleading statements, as more fully set forth above, are misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200, *et seq.*

111.   Plaintiffs relied on Defendant's dolphin-safe representations and Defendant's compliance with traceability and verification requirements and were in fact injured as a result of those false, misleading, and deceptive representations and by Defendant's failure to comply with traceability and verification requirements.

112.   As alleged herein, Plaintiffs have suffered injury in fact and lost money or property at the time of purchase as a result of Defendant's conduct because they were exposed to and purchased Defendant's tuna products in reliance on the dolphin-safe representations, sustainable fishing methods representations, and Defendant's compliance with tracing and verification requirements, but did not receive tuna products that contain tuna caught using fishing methods that do not harm dolphins.

113.   Unless restrained and enjoined, Defendant will continue to engage in the above described conduct. Accordingly, injunctive relief is appropriate.

114.   Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, seek declaratory relief and an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution of all money obtained from Plaintiffs and the members of the Classes collected as a result of unfair competition, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

## COUNT II –
### Violations of the Consumers Legal Remedies Act – Cal. Civ. Code §§ 1750 *et seq.*
### (On Behalf of the California-Only Class)

115.   Plaintiffs Duggan and Myers (the "California Plaintiffs") repeat and incorporate by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

116.   The California Plaintiffs bring this claim individually and on behalf of the California-Only Class.

117.   This cause of action is brought pursuant to the Consumers Legal

Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

118.   The California Plaintiffs are consumers as defined by California Civil Code § 1761(d). The tuna products are "goods" within the meaning of the CLRA.

119.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with the California Plaintiffs and the California-Only Class which were intended to result in, and did result in, the sale of the tuna products:

> (5)   Representing that [the tuna products have] . . . characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .
>
> *      *      *
>
> (7)   Representing that [the tuna products] are of a particular standard, quality, or grade … if they are of another.

120.   Pursuant to California Civil Code §1782(d), the California Plaintiffs and the California-Only Class seek a Court Order declaring Defendant to be in violation of the CLRA, enjoining the above-described wrongful acts and practices of Defendant, and ordering restitution and disgorgement.

121.   Pursuant to §1782 of the CLRA, the California Plaintiffs notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.  A copy of the letter is attached hereto as Exhibit A.

122.   If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the CLRA, the California Plaintiffs will amend this Complaint to add claims for actual, punitive, and statutory damages as appropriate.

123.   Pursuant to §1780 (d) of the CLRA, attached hereto as Exhibit B is the

affidavit showing that this action has been commenced in the proper forum.

**COUNT III –
Violation of Florida Deceptive and Unfair Trade Practices Act – Fla. Stat.
§§501.201, *et seq.*
(On Behalf of the Florida-Only Class)**

124.    Plaintiff Cosgrove repeats and incorporates by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

125.    Plaintiff Cosgrove brings this claim individually and on behalf of the Florida-Only Class.

126.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, §§501.201, *et seq.*, Fla. Stat. ("FDUTPA").  The stated purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." §501.202(2), Fla. Stat.

127.    Plaintiff Cosgrove and the Florida-Only Class are consumers as defined by §501.203, Fla. Stat.  The tuna products are goods within the meaning of FDUTPA.  Defendant is engaged in trade or commerce within the meaning of FDUTPA.

128.    Florida Statute §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FDUTPA also prohibits false and misleading advertising.

129.    Florida Statute §501.204(2) states that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act."  Defendant's unfair and deceptive practices are likely to mislead – and have misled – consumers acting reasonably in the circumstances, and violate §500.04, Fla. Stat., and 21 U.S.C. §343.

130.    Plaintiff Cosgrove and the Florida-Only Class have been substantially

injured and aggrieved by Defendant's unfair and deceptive practices and acts of false advertising in that they paid for tuna products that were not dolphin-safe and/or sustainably caught as represented.   The harm suffered by Plaintiff Cosgrove and Florida consumers was directly and proximately caused by the deceptive, misleading, and unfair practices of Defendant, as more fully described herein.

131.   Pursuant to §§501.211(2) and 501.2105, Fla. Stat., Plaintiff Cosgrove and Florida consumers seek damages, injunctive relief, attorneys' fees and costs against Defendant.

## COUNT IV
### Violations of the New York General Business Law § 349
### (On Behalf of the New York-Only Class)

132.   Plaintiffs Robert and Colleen McQuade, Plaintiffs Anthony and Lori Luciano, Plaintiffs Fidel and Jocelyn Jamelo, and Plaintiffs Borruso and Nugent (the "New York Plaintiffs") repeat and incorporate by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

133.   The New York Plaintiffs bring this claim individually and on behalf of the New York-Only Class.

134.   Defendant's actions alleged herein constitute unlawful, unfair, and deceptive business practices.   Those actions include misrepresenting that the tuna products are "Dolphin Safe" when they are not.

135.   Defendant's conduct constitutes acts, uses and/or employment by Defendant or its agents or employees of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods in violation of §349 of New York's General Business Law.

136.   Defendant's deceptive conduct was generally directed at the consuming public.

137.   Defendant's unfair and deceptive trade acts and practices in violation of §349 of New York's General Business Law have directly, foreseeably, and proximately caused damages and injury to the New York Plaintiffs and other members of the New York-Only Class.

138.   Defendant's deceptive conduct has caused harm to New York-Only Class members in that they purchased the tuna products when they otherwise would not have absent Defendant's deceptive conduct.

139.   Defendant's violations of §349 of New York's General Business Law threaten additional injury to the New York-Only Class members if the violations continue.

140.   The New York Plaintiffs, on their own behalf and on behalf of the New York-Only Class, seek damages, injunctive relief, including an order enjoining Defendant's §349 violations alleged herein, and court costs and attorneys' fees, pursuant to NY Gen. Bus. Law §349.

**COUNT V**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, § 56:8-2.10**
**(On Behalf of the New Jersey-Only Class)**

141.   Plaintiffs Amar and Heena Mody and Plaintiffs Zelig and Petrovcik (the "New Jersey Plaintiffs") repeat and incorporate by reference the allegations contained in paragraphs 1 through 100 above as if fully set forth herein.

142.   Defendant's tuna product packaging constitutes an "advertisement" within the meaning of §56-8-1(a) of the New Jersey Fraud Act, as it is an attempt by publication, dissemination, solicitation, indorsement, or circulation to induce consumers to acquire an interest in Defendant's merchandise.

143.   Defendant's tuna products constitute "merchandise" within the meaning

of §56-8-1(c), as they are directly or indirectly offered to the public for sale and fall within one of the statutory categories of objects, wares, goods, commodities, services, or "anything."

144.   Defendant's tuna products are misrepresented within the meaning of §56:8-2.10, as the descriptions of said products are misleading, the descriptions omit information in ways that render the description false or misleading, and/or the descriptions represent the merchandise as having qualities they do not have.

145.   Specifically, Defendant has violated, and continues to violate, the New Jersey Fraud Act by representing that its tuna products are "Dolphin Safe" when they are not.

146.   The New Jersey Plaintiffs, on their own behalf, and on behalf of the New Jersey-Only Class members, seek damages, injunctive relief, including an order enjoining Defendant's violations of the New Jersey Consumer Fraud Act alleged herein, and court costs and attorneys' fees.

**COUNT VI**
**Violation of the Minnesota Prevention of Consumer Fraud Act (Unlawful Practices) – Minn. Stat. §325F.68, *et seq.* and Minn. Stat. §8.31, *et seq.***
**(On Behalf of the Minnesota-Only Class)**

147.   Plaintiff Kiihne repeats and incorporates by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

148.   Plaintiff Kiihne brings this claim individually and on behalf of the Minnesota-Only Class.

149.   This cause of action is brought pursuant to the Minnesota Prevention of Consumer Fraud Act (Unlawful Practices), Minn. Stat. §325F.68, *et seq.* and Minn. Stat. §8.31, *et seq.* ("MCFA").

150.   The tuna products Defendant sold are "merchandise" as defined in Minn. Stat. §325F.68 and Defendant is a "person" as defined in Minn. Stat. §325F.68.

151.   The MCFA prohibits "[t]he act, use, or employment by any person of

any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. §325F.69(1).

152.   Defendant engaged in unlawful practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of merchandise in violation of the MCFA in at least the following ways:

(a)   Deceptively representing to Plaintiff Kiihne and the Minnesota-Only Class that its tuna products were dolphin-safe, packaged from tuna caught using sustainable fishing methods, and traceable and verifiable;

(b)   Falsely promising Defendant's tuna products were dolphin-safe, packaged from tuna caught using sustainable fishing methods, and traceable and verifiable;

(c)   Failing to warn or disclose to consumers, including Plaintiff Kiihne and the Minnesota-Only Class that its tuna products were not dolphin-safe, were not packaged from tuna caught using sustainable fishing methods, and were not traceable and verifiable;

(d)   Failing to reveal a material fact – that its tuna products were not dolphin-safe, were not packaged from tuna caught using sustainable fishing methods, and were not traceable and verifiable; and

(e)   Making a misrepresentation of material fact or statement of fact material to the transaction – *i.e.*, that its tuna products were not dolphin-safe, were not packaged from tuna caught using sustainable fishing methods, and were not traceable and verifiable – such that a person reasonably believed Defendant's tuna products had such characteristics when they did not.

153.   That Plaintiff Kiihne and the Minnesota-Only Class believed they were

purchasing dolphin-safe tuna caught from sustainable fishing methods with the ability of Defendant to trace and verify its dolphin-safe quality when these representations were not true were material facts and would be material to a reasonable person.

154.    As a direct and proximate result of Defendant's violation of the MCFA, Plaintiff Kiihne and the Minnesota-Only Class have suffered and continue to suffer ascertainable loss in the form of money in that they paid for tuna products that were not dolphin-safe and/or sustainably caught as represented, as more fully described herein.

155.    Plaintiff Kiihne seeks relief under Minn. Stat. §8.31, including, but not limited to, damages and attorneys' fees.

**COUNT VII –**
**Violation of the Minnesota Prevention of Consumer Fraud Act (False**
**Statement in Advertising) – Minn. Stat. §§325F.67, *et seq.***
**(On Behalf of the Minnesota-Only Class)**

156.    Plaintiff Kiihne repeats and incorporates by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

157.    Plaintiff Kiihne brings this claim individually and on behalf of the Minnesota-Only Class.

158.    The tuna products Defendant sold are "merchandise" as defined in Minn. Stat. §325F.68 and Defendant is a "person" as defined in Minn. Stat. §325F.68.

159.    Defendant made materially misleading and deceptive statements to consumers about its tuna products as being dolphin-safe and/or sustainably caught.

160.    This advertising was and continues to be deceptive and misleading because Defendant's tuna products are neither dolphin-safe nor sustainably caught.

161.    Defendant had superior knowledge and bargaining power in its transactions with consumers and misrepresented its tuna products as being dolphin-safe and/or sustainably caught to induce consumers to purchase Defendant's tuna

products. These facts are material because reasonable consumers, like Plaintiff Kiihne would have paid less or, more likely, not purchased the tuna products at all if they had known the products were not dolphin-safe and/or sustainably caught.

162. Plaintiff Kiihne and the Minnesota-Only Class seek an order requiring Defendant to disgorge all ill-gotten gains and provide full restitution of all monies it wrongfully obtained from Plaintiff Kiihne and the Minnesota-Only Class through its false and deceptive advertising of its tuna products.

163. Plaintiff Kiihne and the Minnesota-Only Class also seek an award of damages and attorneys' fees for violations of Minn. Stat. §325F.67 pursuant to Minn. Stat. §8.31, subd. 3a.

**COUNT VIII –**
**Violation of the Minnesota Uniform Deceptive Trade Practices Act – Minn. Stat. §§325D.43, *et seq.***
**(On Behalf of the Minnesota-Only Class)**

164. Plaintiff Kiihne repeats and incorporates by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

165. Plaintiff Kiihne brings this claim individually and on behalf of the Minnesota-Only Class.

166. This claim is brought under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §§325D.43, *et seq.* (the "MDTPA")

167. Defendant is a "person" as defined in the MDTPA.

168. Under the MDTPA, a person engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person:

(a) "[R]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have";

(b) "[R]epresents that goods or services are of a particular standard,

quality, or grade, or that goods are of a particular style or model, if they are of another"; and

(c) "[A]dvertises goods or services with intent not to sell them as advertised." (Minn. Stat. §325D.44 (5)(7)(9)).

169.   Defendant violated these provisions of the MDTPA by:

(a)   Deceptively representing to Plaintiff Kiihne and the Minnesota-Only Class that the tuna products were dolphin-safe and/or sustainably caught;

(b)   Falsely advertising the tuna products as dolphin-safe and/or sustainably caught;

(c)   Failing to warn or disclose to consumers, including Plaintiff Kiihne and the Minnesota-Only Class, that the tuna products were not dolphin-safe nor sustainably caught contrary to Defendant's representations;

(d)   Failing to reveal a material fact – that Defendant's tuna products were neither dolphin-safe nor sustainably caught as represented – the omission of which tends to mislead or deceive consumers, and which fact could not reasonably be known by consumers; and

(e)   Making a representation of fact or statement of fact material to the transaction – *i.e.*, that Defendant's tuna products were dolphin-safe and/or sustainably caught – such that a person reasonably believed they were when they were not.

170.   Plaintiff Kiihne and the Minnesota-Only Class believed they were purchasing dolphin-safe and sustainably caught tuna products when they were not. These were material facts and would be material to a reasonable person.

171.   The above unlawful and deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

172. As a direct and proximate result of Defendant's violation of the MDTPA, Plaintiff Kiihne and the Minnesota-Only Class have suffered and continue to suffer ascertainable loss in the form of money.

173. Pursuant to Minn. Stat. §325D.45, Plaintiff Kiihne seeks individually and on behalf of all others similarly situated, all available remedies under law, including, but not limited to, actual damages, costs, and attorneys' fees.

## COUNT IX
## Unjust Enrichment/Quasi-Contract

174. Plaintiffs repeat and incorporate by reference the allegations contained in the paragraphs 1 through 100 above as if fully set forth herein.

175. Plaintiffs and Class members conferred a benefit on Defendant by purchasing the tuna products.

176. Defendant appreciated and/or realized the benefits in the amount of the purchase price it earned from sales of the tuna products to Plaintiff and Class members or, at a minimum, the difference between the price it was able to charge Plaintiffs and Class members for the tuna products with the dolphin-safe representations and sustainable fishing method representations and the price it would have been able to charge absent the same.

177. Defendant has profited from its unlawful, unfair, false, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

178. Plaintiffs do not have an adequate remedy at law against Defendant.

179. Plaintiffs and Class members are entitled to restitution of all monies paid for the tuna products or, at a minimum, the premium paid for the tuna products.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for a judgment:

     A.     Certifying the Classes as requested herein;

     B.     Issuing an order declaring that Defendant has engaged in unlawful, unfair, and deceptive acts and practices in violation of the consumer fraud laws in the certified states;

     C.     Enjoining Defendant's conduct and ordering Defendant to engage in a corrective advertising campaign;

     D.     Awarding the Classes damages, including statutory and punitive damages, and interest thereon;

     E.     Awarding disgorgement and restitution of Defendant's ill-gotten revenues to Plaintiffs and the Classes;

     F.     Awarding attorneys' fees and costs; and

     G.     Providing such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated:  May 13, 2019          BONNETT, FAIRBOURN, FRIEDMAN
                        & BALINT, P.C.

                        /s/*Patricia N. Syverson*
                        Patricia N. Syverson (203111)
                        Manfred P. Muecke (222893)
                        600 W. Broadway, Suite 900
                        San Diego, California 92101
                        psyverson@bffb.com
                        mmuecke@bffb.com
                        Telephone:  (619) 798-4593

                        BONNETT, FAIRBOURN, FRIEDMAN &
                        BALINT, P.C.
                        Elaine A. Ryan (*To Be Admitted Pro Hac Vice*)
                        Carrie A. Laliberte (*To Be Admitted Pro Hac Vice*)
                        2325 E. Camelback Rd., Suite 300

Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone:  (602) 274-1100

GOLDMAN SCARLATO & PENNY P.C.
Brian D. Penny (*To Be Admitted Pro Hac Vice*)
penny@lawgsp.com
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone:  (484) 342-0700

ZAREMBA BROWN PLLC
Brian M. Brown (*To Be Admitted Pro Hac Vice*)
bbrown@zarembabrown.com
40 Wall Street, 52nd Floor
New York, NY 10005
Telephone: (212) 380-6700

ROBBINS GELLER RUDMAN & DOWD LLP
Stuart A. Davidson (*To Be Admitted Pro Hac Vice*)
Christopher C. Gold (*To Be Admitted Pro Hac Vice*)
Bradley M. Beall (*To Be Admitted Pro Hac Vice*)
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

Attorneys for Plaintiffs

Class Action Complaint